J-A26028-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF R.Y.M.B. A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: J.B., FATHER | |
| | No. 1210 EDA 2021 |

Appeal from the Decree Entered March 25, 2021
In the Court of Common Pleas of Montgomery County
Orphans' Court at No.: 2020-A0172

BEFORE:  BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY STABILE, J.:                    **FILED MARCH 9, 2022**

Appellant J.B. ("Father") appeals from the decree entered on March 25, 2021 in the Court of Common Pleas of Montgomery County ("orphans' court"), which terminated involuntarily his parental rights to his daughter, R.Y.M.B. ("Child"), born in September 2018.  Upon review, we affirm.

We glean the facts and procedural history of this case from the certified record.  On September 20, 2018, A.H. ("Mother") gave birth to Child who arrived at 30 weeks, weighed only two pounds and tested positive for marijuana because of Mother's drug use.  Father also struggled with substance abuse and had a criminal history.  A referral was made to the Montgomery County Office of Children and Youth ("OCY"), which consequently established a safety plan.  In this regard, two individuals were designated to ensure Child's safety by, among other things, supervising parents' contact with Child.  Thus,

according to the safety plan, Mother and Father were not permitted to have unsupervised contact with Child.[1]  On November 4, 2018, OCY received a report that Mother violated the safety plan by leaving Child with maternal grandfather who was not a designated resource under the safety plan.  The next day, Mother tested positive for illicit substances following a urine screen.  Given Mother's continued substance abuse, OCY petitioned that Child be adjudicated dependent, but that her legal and physical custody remain with Mother under the safety plan.  On November 20, 2018, the court granted OCY's petition, adjudicating Child dependent.  The court, however, directed that Mother and Father continue to abide by the terms of the safety plan and, as a result, have no unsupervised contact with Child.  The court additionally ordered parents to undergo urine tests.

OCY subsequently obtained emergency custody of Child, citing in part Mother's substance abuse and inability to comply with the safety plan.  The court transferred legal and physical custody of Child to OCY.  Following a shelter hearing, the court ordered that Child remain in OCY's custody.  On December 11, 2018, the court issued a dispositional order, finding that Child was without proper care or control and determining that Child remain in OCY's custody.

---

[1] Although not clear from the record, it appears that Mother and Child were directed to live with the two individuals identified in the safety plan.  This lack of clarity, however, does not affect our disposition of this case.

Thereafter, several permanency review hearings were conducted. It was recommended that Father comply with random urine screen. The court found, following each permanency review hearing, that Father was not in compliance with the permanency plan because of his incarceration and made no progress toward alleviating the circumstances which necessitated the original placement of Child. Father also did not maintain contact with Child and was not considered a resource for her. However, Father's mother ("Paternal Grandmother") eventually was identified as a kinship resource for Child, who then transitioned from OCY's care to the home of Paternal Grandmother. Child's legal and physical custody, however, remained with OCY.

In the September 14, 2020 permanency review order, parents were put on notice that OCY intended to file a petition to terminate parental rights because Child "has been in placement for 15 of the last 22 months or will be in placement for such period consistent with the permanency plan developed for [Child], or the court has determined that aggravated circumstances exist and no further effort to reunify the family need be made[.]" Permanency Review Order, 9/14/20, at 2.

On November 23, 2020, OCY filed the instant petition to terminate involuntarily Father's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1),

(2), and (8).[2]  The orphans' court appointed Kyle Felty, Esquire, as guardian *ad litem* for Child.  On March 25, 2021, the orphans' court conducted a hearing on the termination petition and both OCY and Father presented testimony.  First, OCY called to the stand Dr. Stephen Miksic, who testified about his attempts to evaluate Father.  N.T., Hearing, 3/25/21, at 22-24.  Specifically, Dr. Miksic testified that after he received a court order and a separate referral from OCY to perform a bonding assessment on Father, he attempted to contact Father to schedule an evaluation.  *Id.*  22-23.  Dr. Miksic, however, was unable to evaluate him, as Father did not comply with the court-ordered bonding assessment.  *Id.* at 23-24.

OCY next called to the stand Amanda Martinez, who testified that, for the past five years, she had been employed as a caseworker for OCY.  *Id.* at 25-26.  Ms. Martinez testified that, on September 21, 2018, OCY received a referral regarding Child.  *Id.* at 26.  According to Ms. Martinez, when Child was born in September 2018, "the hospital – [M]other had made it known that she did not have the proper equipment, and there were some issues with substance abuse."  *Id.*

Ms. Martinez recalled that at the time of Child's birth, Father was living with Paternal Grandmother in Pottstown, Pennsylvania.  *Id.*  Ms. Martinez further recalled that, on October 23, 2018, OCY created a safety plan with

---

[2] On November 20, 2020, OCY also filed a petition to terminate involuntarily Mother's parental rights, but Mother later voluntarily relinquished them.  N.T., Hearing, 3/25/21, at 6-12.

- 4 -

regard to Child pursuant to which Mother and Father were not permitted to have unsupervised contact with Child. *Id.* at 27. Ms. Martinez testified that Father was not considered a supervising resource for Child because he "did not want to provide any drug testing to [OCY]." *Id.*

On November 7, 2018, OCY filed a dependency petition, alleging that Child was without proper parental care or control. *Id.* Ms. Martinez stated that on November 20, 2018, following a hearing, Child was adjudicated dependent. *Id.* The safety plan, however, remained in place. *Id.* at 28. As a result, the requirement that Father be supervised around Child remained in place. *Id.* On November 26, 2018, OCY assumed emergency custody of Child because of Mother's refusal to abide by the terms of the safety plan. *Id.* At the time, Father was not considered a placement resource for Child. *Id.* According to Ms. Martinez, Father "was not willing to work with [OCY] or comply with [OCY's] request for drug screens." *Id.* Father still was residing at Paternal Grandmother's house. *Id.* at 29. Child eventually was placed in a foster home in Telford, Pennsylvania. *Id.* On December 11, 2018, the court conducted a dispositional hearing, following which the court determined that Child remain in OCY's custody. *Id.* Following permanency review hearings, Child transitioned to the care of Paternal Grandmother in July 2020. *Id.* at 30.

Ms. Martinez testified that she met Father during the 2018 adjudication and dispositional hearings. *Id.* at 31. She recalled that she reviewed the safety plan with Father at the time of the dispositional hearing and that he

understood what he had to do to be reunified with Child. *Id.* at 32. Ms. Martinez further recalled that after Child was adjudicated dependent and after OCY assumed custody over her, Father was arrested. *Id.* Specifically, Father was incarcerated from January 19, 2019 until August 20, 2020. *Id.* at 33. Ms. Martinez stated that, while Father was incarcerated, she sent him a family services plan. *Id.* However, Father never contacted her during his period of incarceration. *Id.* It was nearly a month after his release—on September 30, 2020—that he reached out to Ms. Martinez. *Id.* at 33-34.

Ms. Martinez met with Father on October 5, 2020 and, at that meeting, reviewed with him the family services plan.[3] *Id.* at 34. Describing the goals set for Father in the family services plan, Ms. Martinez testified that "[h]e needed to be able to financially support [Child], maintain proper housing, maintain visits and contact with [Child], and maintain sobriety as well." *Id.* With respect to sobriety, Ms. Martinez recalled that she was only able to obtain a drug screen from Father when the court ordered him to submit to one on the day of the 2018 adjudication hearing. *Id.* at 35. Father then tested positive for THC. *Id.* She testified that Father never received a drug and alcohol evaluation. *Id.*

Regarding housing, Ms. Martinez testified that Father never was considered a resource for Child, especially from the time of Child's birth in September 2018 until Father's arrest and incarceration in January 2019. *Id.*

---

[3] According to Ms. Martinez, the October 5 meeting with Father was her first interaction with him outside of court hearings. N.T., Hearing, 3/25/21, at 34.

at 35-36. According to Ms. Martinez, Father did not have "appropriate housing for Child when OCY became involved" because of his substance abuse. *Id.* at 36. As a result, she explained, Father never asked for Child to reside with him. *Id.* She recalled that upon his release from prison and when she met him in October 2020, Father did not have appropriate housing for Child. *Id.* 36-37. When asked whether Father had appropriate housing for Child at the time of the hearing, Ms. Martinez answered that OCY was "unaware of where he lives at this time." *Id.* at 37.

With respect to financial stability, Ms. Martinez testified that Father had never been able to support Child. *Id.* at 37-38. Ms. Martinez further testified that she did not know whether Father was employed at the time of the hearing. *Id.* at 38. Father never provided any proof of employment or income to OCY. *Id.* at 37.

Finally, Ms. Martinez recalled that Father never contacted her to set up visitations with Child when Child was remanded into OCY's custody in 2018. *Id.* at 38. Prior to his arrest in January 2019, Father never attempted to visit with Child. *Id.* at 39. Ms. Martinez testified that, while incarcerated, Father never wrote any letters to Child or asked for her pictures. *Id.* Father, however, did ask OCY for an in-person meeting with Child during the February 14, 2020 permanency hearing.[4] *Id.* That meeting never occurred. *Id.* at 40.

---

[4] Ms. Martinez testified that Father attended "six out of the seven permanency reviews" and was aware of what he needed to do to seek reunification with Child. N.T., Hearing, 3/25/21, at 54-55.

The court ruled that visitations would commence once Child was placed in the care of Paternal Grandmother. *Id.* Thereafter, because of COVID-19, Father did not make additional visitation requests. *Id.* at 40. Ms. Martinez pointed out that the February 14 request for visitation was Father's sole attempt to see Child until October 2020. *Id.*

Ms. Martinez stated that Father had his first in-person visit with Child on October 24, 2020, when Child was "just over two years old." *Id.* at 39, 41. Ms. Martinez recalled:

> We were going to have biweekly visits for two hours. Unfortunately, shortly after we started – so that was the 24th. Then [Father] had exposure to COVID. So he had to quarantine. So we had a couple weeks off. And then the visits were reinstated after that quarantine period was over. [Paternal Grandmother] helped us supervise one, and then they were supervised by Open Door until December of 2020, when, again, we were advised to do all visits virtually because of COVID pandemic.

*Id.* at 41. The visits remained supervised and never increased from the biweekly two hours. *Id.* Ms. Martinez testified that the last visit with Father was scheduled "three weeks ago on a weekend," but Father did not show up because he overslept. *Id.* at 42. Child has never resided with Father. *Id.* Father has never taken care of nor assumed full responsibility for Child. *Id.*

According to Ms. Martinez, Paternal Grandmother welcomed Child into her home in July 2020 and is considered a pre-adoptive resource. *Id.* at 42-43. Ms. Martinez testified that she has observed Child in Paternal Grandmother's care and that Child is "doing very well." *Id.* at 43. Child has bonded with Paternal Grandmother. *Id.* "[Child] always wants to know where

her grandmother is. If we're walking around, she looks to her for comfort. If she's upset, she looks to her. For guidance, she looks to her. So, they're very bonded." *Id.* Paternal Grandmother is looking after Child's medical and emotional needs. *Id.* Ms. Martinez stated that when Child is together with Paternal Grandmother, Child appears happy. *Id.* at 43-44. Paternal Grandmother meets Child's daily needs and also takes Child to speech therapy once a week. *Id.* at 44. Ms. Martinez testified that Child refers to Paternal Grandmother as "mom-mom." *Id.* Ms. Martinez also testified that Paternal Grandmother would allow Child to have contact with Father. *Id.*

Ms. Martinez recommended that, considering the best interest of Child, Father's parental rights to Child be terminated to allow for adoption. *Id.* at 45. Ms. Martinez opined that Child would not be irreparably harmed if Father's rights were terminated. *Id.*

On cross-examination, Ms. Martinez acknowledged that Father was present at all nine hearings in this matter. *Id.* at 46. She added that he was incarcerated for most of 2019 and 2020 and "[t]hat's why he was at most of the hearings. He was transported back." *Id.* When asked whether Father completed the Parenting Inside Out course offered in prison, Ms. Martinez replied in the negative, stating that she never received any certificates. *Id.* She conceded that it was difficult for prisoners to communicate with people outside of prison. *Id.*

Ms. Martinez acknowledged that although Father informed her that he had found employment upon his release from prison, she did not have any

"proof of that." *Id.* at 48. She stated that Father failed to satisfy her request for some paystubs. *Id.* Ms. Martinez also stated that Father had his first in-person visit with Child on October 24, 2020 at Paternal Grandmother's house. *Id.* at 49. "Well, after the two weeks, because of COVID and because of schedule being off, [Paternal Grandmother] stepped in and helped out [OCY] and supervised a visit. And then after that one, Open Door continued to have supervised visits." *Id.* Ms. Martinez estimated that Father had seven in-person visits with Child since his release from prison. *Id.* at 50. She also estimated that Father had four virtual visits—one per week—with Child in December 2021. *Id.* Father's last, an in-person, visit was approximately five weeks before the hearing. *Id.* at 51.

Ms. Martinez repeated that Father did not have appropriate housing for Child and that this has been an ongoing problem since the start of this case. *Id.* She further stated that, as of March 13, 2021, Father has not confirmed his current address in Phoenixville. *Id.* at 52. According to Ms. Martinez, she visited Father's previous residence in January 2021 and it was not appropriate for Child. *Id.* She explained,

> [t]here was an unidentified person staying in that home, and they were unwilling to share the information. So, I didn't know all of the household members. And then there was nothing there that – there's nothing present in the home for [Child]. So for [Child], it would be inappropriate. There was no bedding. There was no room for her to stay there.

*Id.* at 57. Mr. Martinez acknowledged that she advised Father what he needed to do "to make the housing appropriate." *Id.*

- 10 -

In response, Father called to the stand his mother, Paternal Grandmother. *Id.* at 62. Recalling Father's visits with Child, she testified that "[he] was very attentive and tried to coax her into do [sic] some, you know, different colors, see if she knew any of her alphabet and just ate with her and just devoted his whole time to her." *Id.* at 63. Paternal Grandmother testified that Father acted appropriately "as far as the role of a parent during those visits." *Id.* She further testified that, during those visits, she did not "feel the need to intervene or give him any guidance." *Id.* at 64. Paternal Grandmother, however, remarked that she had to help Father familiarize himself with the surroundings by showing him where Child's diapers or toys were located. *Id.* Explaining Father's desire to retain his parental rights, Paternal Grandmother stated:

> Just as a mother, that's my son – we had a recent conversation that the only reason he doesn't want to give up his parental rights is that, in fear, tomorrow I might get hit by a car or whatever and he totally loses her. But either way it goes, he's still going to be involved with her.

*Id.* at 65.

On cross-examination, Paternal Grandmother acknowledged that she supervised only one visit between Father and Child that lasted approximately 90 minutes. *Id.* at 66. However, she stated that she was present at her house during other in-person visits where she observed Father's interactions with Child. *Id.* Paternal Grandmother testified that, as of the time of the hearing, it was in Child's best interest to remain with her. *Id.* at 67. She

explained that Child has a room at her house.  *Id.*  She has a babysitter for Child.  *Id.*  She also noted that Child has classes every week.  *Id.*  Paternal Grandmother expressed concern about Father's stability, noting that "[h]e has a lot going on."  *Id.*  Indeed, she acknowledged that Father was not—and never was—in a position to provide for the needs of Child.  *Id.* at 68.  Acknowledging that Father's situation would not change overnight, she expressed hope that Father might be able to provide for Child "next year."  *Id.*

Father next testified on his own behalf.  *Id.* at 69.  He testified that, contrary to Ms. Martinez's testimony, he did complete an eight-week parenting course that was offered twice a week for two hours in prison.  *Id.* at 69-70.  Without objection, Father introduced and admitted into the record a certification of completion for the course.  *Id.* at 71-72.  Father also testified that, contrary to Ms. Martinez' testimony, he did request to spend time with Child.  *Id.* at 73.

> She mentioned that I had not requested to spend more time with [Child].  If I'm not mistaken, I'm more than sure, if you would check the record, I have requested on multiple occasions to have visits with [Child] even during the period of my incarceration, and I was denied for different reasons, but this being before COVID and after COVID.  Since I have been home, I also inquired about the length and time of my visit and how it works for getting an extended time to spend with [Child].

*Id.* at 73-74.  With respect to housing, Father acknowledged:

> There is some truth to the fact that I am currently in differences [sic] due to my living arrangement.  I have been staying with one of my family members in Phoenixville during the last two weeks.

- 12 -

I'm currently in contact looking to get an apartment or house through a few agencies with some of the things I've done. They're willing to help me due to the fact that I have a job and maintaining employment since October 13th of last year.

*Id.* at 74. Father clarified that, since October 13, 2020, he has been employed full time with health benefits at an electrical foundry, working 40 hours per week. *Id.* at 74-76. Describing his job, Father testified:

I have been, up to this point, working a shift 6:00 in the morning until 2:30 in the afternoon. I've currently been referred for surgery. So I have been off for the last week or so. During that time, I've been looking to achieve some of the goals that were set for me. I've also acquired a vehicle, so I have reliable transportation to help me commute during these times.

*Id.* at 76. He further testified that he had a few things on his to-do list, including getting drug evaluation and assessment and obtaining appropriate housing. *Id.*

Father expressed his love for Child and acknowledged that he had not been able to spend a lot of time with her. *Id.* at 77. Father, however, stated that, contrary to Ms. Martinez's testimony, he did spend time with Child when Child was hospitalized as a newborn. *Id.* at 109. Father testified that he did not want to give up on Child. *Id.* at 77. He also acknowledged that, regardless of the outcome of OCY's termination petition, he may be able to have a relationship with Child. *Id.*

On cross-examination, Father acknowledged that Child never lived with him because "for a large part of her life" he was incarcerated. *Id.* at 79. He clarified that, despite searching, he had not yet secured housing. *Id.* Father

also acknowledged that he had not yet completed drug and alcohol treatment. *Id.* He explained that he still had to "go to the actual place and sign the paperwork." *Id.*

Father acknowledged that he missed his last visit with Child because he overslept. *Id.* at 80. He also acknowledged that he never furnished OCY with proof of his employment. *Id.* at 81. Father clarified that for the past three weeks, he had been living with his aunt and, before that, with his father in Pottstown, Pennsylvania. *Id.* at 82. Father explained that Ms. Martinez visited him at his father's residence. *Id.* at 83. He acknowledged that he failed to inform OCY of his change in residency. *Id.* Father agreed that, at the time of the hearing, he did not have appropriate housing for Child. *Id.* at 84. Explaining why he failed to seek timely drug and alcohol evaluation, Father stated that "[w]ell, I have been working. There's really no excuse as to why. I just don't have transportation to try to go back and forth. I pretty much walk everywhere I go, up until recently. And Pottstown isn't that big, but it's not that small either." *Id.* at 84-85. Father stated that he was incarcerated in January 2019 because he violated his parole. *Id.* at 85. Father acknowledged that, at the time of the hearing, he was unable to meet Child's needs. *Id.* Father explained:

> At this very moment, I'm not. I would have to agree with some extent as far as that goes. As far as having a shelter for her, I'm not able to do that. As far as providing for her in other ways, as far as food, clothing, and things of this nature, I do my part with that. Realistically, I'm not going to sit here and lie to you or the [c]ourt. I am not at this very minute capable of providing shelter for her and fulfilling all of her needs.

*Id.* at 86. When asked whether it was in Child's best interest to be in a stable and loving home that can provide for all of her needs, Father replied:

> Yes, I would agree with that fully, which is why I have not pressed the issue fully of taking her on as a responsibility as far as providing shelter for her at this moment because I don't want her to be without security. So, yes, I would have to agree with you on that. My whole issue with that is, in the present moment, it would be ideal for her to possess that security again. I don't want to lose contact or touch with my daughter or anyone in my family for that matter. I'm not only thinking for the present moment. I'm thinking for the future as well. I don't know if any one of you are parents yourself, but if you are parents, I'm quite sure that you can understand where I'm coming from as a human today.

*Id.* at 86-87. Finally, Father acknowledged that Paternal Grandmother was the intended adoptive parent of Child and that she would provide Child safety, stability and security. *Id.* at 89. Following the hearing, the orphans' court granted OCY's petition to terminate involuntarily Father's parental rights under Section 2511(a)(1), (2), and (8). Father timely appealed. Both Father and the orphans' court complied with Pa.R.A.P. 1925.

On appeal, Father raises five issues for our review.

> [I.] Did the [orphans'] court err in terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) where the evidence at trial failed to establish by clear and convincing evidence that [] Father evidenced a settled purpose of relinquishing his parental claim to [Child] or refused or failed to perform parental duties during the six month time period immediately preceding the filing of the [termination petition]?

> [II.] Did the [orphans'] court err in terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) where the evidence at trial failed to establish by clear and convincing evidence any repeated and continued incapacity, abuse, neglect or refusal to parent by [] Father which caused [Child] to be without essential

- 15 -

parental care, control or subsistence necessary for her physical or mental well-being?

[III.] Did the [orphans'] court err in terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) where the evidence at trial failed to establish by clear and convincing evidence any repeated and continued incapacity, abuse, neglect or refusal to parent by [] Father cannot or will not be remedied by [] Father?

[IV.] Did the [orphans'] court err in terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) where the evidence at trial failed to establish by clear and convincing evidence that the conditions which led to the removal or placement of [Child] continue to exist and termination of parental rights would best serve the needs and welfare of [Child]?

[V.] Did the [orphans'] court err in terminating [Father's] parental rights where the evidence at trial failed to establish by clear and convincing evidence that the development, physical and emotional needs and welfare of [Child] will be best served by termination of [] Father's parental rights?

Father Brief at 7-8 (sic).[5]

We review Father's claims in accordance with the following standard of

review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to [orphans'] courts

_____

[5] Child's guardian *ad litem* did not file a separate brief in this appeal. Instead, he joined OCY's brief.

- 16 -

that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights to Child pursuant to subsection 2511(a)(1), (2), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision only pursuant to subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .

- 17 -

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by assessing whether the orphans' court committed an abuse of discretion by terminating Father's rights to Child pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental

duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).[6]  As we recently explained in ***In re Adoption of K.M.G.***, 219 A.3d 662 (Pa. Super. 2019) (*en banc*):

> The grounds for termination under Section 2511(a)(2) are not limited to a parent's affirmative misconduct, but rather a parental incapacity that a parent cannot remedy.  Parents have an "affirmative duty" to work towards the return of their children.  This "affirmative duty," at a minimum, requires a parent to cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform his parental duties and responsibilities.
>
> Additionally, the statute ***does not provide a parent with an unlimited period*** [***of***] ***time to overcome the incapacity that led to the adjudication of the child; rather, a parent must make a diligent effort towards overcoming the incapacity so that the parent can assume his parental duties within a reasonable period of time after the adjudication of dependency***.
>
> This Court has explained, Section 2511(a)(2) does not focus on a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being.  Therefore, when addressing the requirements of Subsection (a)(2), the orphans' court should not ignore a child's need for a stable home and strong, continuous parental ties.  This factor is particularly important when the disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

***K.M.G.***, 219 A.3d at 672-73 (quotation marks, citations and brackets omitted) (emphasis added).

---

[6] Although not relevant to the disposition of this appeal, the Supreme Court recently overruled on other grounds ***A.L.D.*** in ***In re S.K.L.R.***, 256 A.3d 1108, 1124 (Pa. 2021).

Here, Father claims that the orphans' court decision to terminate his parental rights under Section 2511(a)(2) was not supported by sufficient evidence. Father's Brief at 20. His claim lacks merit. As the orphans' court found:

> In the past six months, since October 2020, [Father] has had approximately seven in-person visits of 1.5 to 2 hours and approximately four visits virtually that were conducted virtually during a period that [OCY] stopped providing in-person visits due to concerns about escalating rates during the COVID pandemic in December of 2020. He missed his most recent visit because, as he candidly acknowledged, he overslept.
>
> [Father] has testified that he obtained employment full time with [an electrical foundry] in October 2020, and he testified he is now living with a family member in Phoenixville as of three weeks ago. He's not confirmed his residence nor provided pay stubs as proof of his employment to [OCY]. He has recently begun the process to obtain a drug and alcohol evaluation but has not completed that process and has not provided a copy of the drug and alcohol evaluation to [OCY]. He did provide evidence to the court of participation in a parenting class during his incarceration.
>
> [Father] expressed that he loved his daughter, even though he admits that he has had only a short time to be with her. He acknowledges that he doesn't currently have a residence where she can live with him, and he acknowledges he is not ready to be a full-time parent at this time. He agreed that he's not ready to meet the needs of his daughter, but he did say that he's now able to contribute to her food and clothing.
>
> Moreover, apart from the most recent period of approximately six months, since October of 2020 to the present, [Father] has had little to no contact with his daughter for the first two years of her life and has failed and refused to act as a full parent to her providing no financial, emotional, or physical support to her, sending no cards, letters, or gifts, and has failed to overcome the obstacles in his way to create and maintain a place of importance in her life.

- 20 -

N.T., Hearing, 3/25/21, at 98-100. As the court explained, Father's incapacity to be a parent to Child or meet her needs continued from birth until the time of the hearing. He lacked stable and appropriate housing, financial stability, and failed either to submit himself to or complete drug and alcohol evaluations considering his history of substance abuse. To the extent Father testified that he now has begun, but not completed, drug and alcohol evaluation, such testimony may be rejected as disingenuous. *See A.L.D.*, 797 A.2d at 340 ("[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely and disingenuous."). Indeed, Father continued in his failure to comply with his affirmative duty to cooperate with OCY when he failed to provide OCY with information regarding housing, employment and drug evaluations. Moreover, Father admitted at the hearing that he was not ready to care for Child. Even his mother, Paternal Grandmother, estimated that Father may not be ready to assume full parental responsibilities for another year. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Thus, we agree with the orphans' court that Father's continued incapacity caused Child to be without essential parental care and that he failed to make a diligent and timely effort towards overcoming the incapacity so that he could assume his parental duties.

Accordingly, based on the evidence of record, Father's repeated and continued incapacity under Section 2511(a)(2) has caused Child to be without essential parental care for the entire life of the case, and Father has failed to meet the goals necessary to remediate the causes of his incapacity. ***See Adoption of J.J.***, 515 A.2d 883, 891 (Pa. 1986) ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.").

We consider next whether the orphans' court abused its discretion by terminating Father's rights pursuant to subsection 2511(b). We adhere to the following analysis.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the [orphans'] court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the [orphans'] court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***C.D.R.***, 111 A.3d at 1219 (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)). Furthermore, our Supreme Court has explained that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id.*** at 269. The ***T.S.M.*** Court observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Here, Father argues that he shares a bond with Child and that insufficient evidence exists to support the orphans' court's conclusion that termination of his parental rights would best serve the developmental, physical, and emotional needs and welfare of Child. His argument is belied by the record. Instantly, it is clear that the orphans' court considered Child's bond with Father when reaching its decision, as our case law requires. However, the mere existence of a bond does not preclude the termination of parental rights. ***N.A.M.***, 33 A.3d at 103. As stated above, a court may place equal or greater weight on the many other factors that could be relevant to a child's needs and welfare, including the child's need for permanence and stability, as well as his or her relationship with pre-adoptive foster parents. ***C.D.R.***, 111 A.3d at 1219.

In this case, as discussed during our analysis of subsection 2511(a)(2), the record demonstrates that Child is in dire need of permanence and stability, which Father cannot provide. In addition, Child has a strong and positive relationship with her pre-adoptive foster parent (Paternal Grandmother), who has been a consistent caregiver in her life. ***See Matter of Adoption of M.A.B.***, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time."). As the orphans' court reasoned:

> In this case, the testimony establishes that [Father] has not maintained sufficient contact nor sought sufficient opportunities to develop a meaningful long-term parental relationship with [Child] in which he has developed a secure bond in which she can turn to him as a parental figure. Therefore, the [c]ourt finds that there is not a healthy and strong parental bond between [Child] and [Father]. The [c]ourt acknowledges that [Father] states that he loves [Child] and credits his testimony in this regard, but the standard for creation of a strong and healthy parental bond is something more than love and affection.
>
> [Father] has not provided a home, has not met [Child's] needs, has not provided for [Child] financially, at least not prior to the most recent period, and has had very limited visits with [Child] throughout her life. Therefore, he has not developed and maintained a strong parent/child relationship.
>
> [The court] conclude[s] that the emotional needs and welfare of [Child] will best be met by termination of the parental rights of [Father] and that [Child] will not suffer a detriment as a result of the termination of the parental rights of [Father].
>
> [The court] also conclude[s] that [Child] is bonded, safe, and secure in a loving home with her foster mother [(Paternal Grandmother)] and that adoption of [Child] so she may maintain permanence and security will be in her best interest.

N.T. Hearing, 3/25/21, at 104-05. Child also refers to Paternal Grandmother as "mom-mom." N.T., Hearing, 3/25/21, at 44. Accordingly, we conclude that the evidence of record demonstrates that terminating Father's parental rights will best serve Child's developmental, physical, and emotional needs and welfare under Section 2511(b).[7]

In sum, in light of the foregoing, we conclude that the orphans' court did not abuse its discretion by termination Father's parental rights to Child involuntarily. We, therefore, affirm the orphans' court's March 25, 2021 decree.

Decree affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/09/2022

---

[7] We note in passing that because the pre-adoptive resource is Father's mother (Paternal Grandmother), Father could have the ability to have ongoing contact with Child in the future.